Marvin Woodard
Reg.No.98908-011
Cornell Corrections
111 Taylor Street
San Francisco CA 94102

Pro Se Petitioner

*Original*

E-filing

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Marvin Woodard

     Plaintiff

VS
Christopher Cruz Community
Manager For Bureau Of Prisons
Maria Richard the Director For
Cornell Corrections

     Respondent.

Case No. **CV 08** _____ **2765**
(To be provided by the clerk of court)

Petition For A Writ Of Habeas Corpus
Pursuant To 28 U.S.C. 2241

**SI**
**(PR)**

    Petitioner Marvin Woodard, currently incarcerated at Cornell Correction, and is

Schedule for release on June 11, 2008, moves this court pursuant to 28 U.S.C. 2241 for a

Writ directing the Bureau of Prisons and Cornell Correction to return all funds that was

Paid out for the 25% subsistence collection that was in forced to help defray the cost of

my incarceration. It is also requested that the court fine that the BOP is in violation of

The judgment of commitment, and statute 18 U.S.C. 3621(b)and 3624(c), and the

Administrative Procedure Act.

BACKGROUND

    Petitioner is serving a 120-month sentence following conviction for conspiracy

1

To possess a controlled substance with intent to distribute. Petitioner began

Serving his sentence at FPC Lompoc on April 28, 2003. His current release date is

June 11,2008. Petitioner was transfer to Cornell Corrections located in San Francisco

California. To comply with Statute 18 U.S.C. 3624(c) the BOP implemented

Program Statement 7310.04 that provides the Bureau of Prisons shall to the extent

Practicable, assure that a prisoner serving a term of imprisonment spends a

Reasonable part, not to exceed six months, of conditions that will afford the

Prisoner a reasonable opportunity to adjust to and prepare for the prisoner's reentry

Into the community.

The authority provided by this subsection may be used to place a prisoner in home

Confinement. The United States Probation Office shall, to the extent practicable offer

Assistance to a prisoner during such pre release custody. 18 U.S.C. 3621(b) provides

The Bureau of Prisons shall designate the place of the prisoner's imprisonment
The Bureau may designate any available penal or correctional facility... the
Bureau determines to be appropriate and suitable. A CCC meets the definition
Of a penal or correctional facility.

Section 3624(c), however does restrict the Bureau in placing inmates on home
Confinement to the last six months or 10% of the sentence, whichever is less.

Community Corrections Centers commonly referred to as halfway houses,
Provide suitable residence structured programs job placement, and counseling
While the inmates activities are closely monitored. All CCCs offer drug testing and
Counseling for alcohol and drug related problems. During their stay, inmates are
Required to pay a subsistence charge to help defray the cost of their confinement; this
Charge is 25% of their gross income, not to exceed the average daily cost of their CCC
Placements. Failure to make subsistence payments may result in disciplinary action.

I objected to the BOP and cornell corrections subsistence charge of my 25% gross

Income because the judgment of commitment did not address the subsistence charge

And the court had waived my cost of incarceration fee.3) The BOP program statement

7310.04 was implemented in violation of the Administrative Procedure Act by failing

To articulate a rational basis for its decision to force inmates to pay 25% of its gross

Income during the Pre-Release stage of its sentence, to comply with statute 18 U.S.C.

3621(b).

4) The BOP and Cornell Corrections is running a program that is discriminatory

And contrary to the existing statute to certain groups of inmates. Under the arbitrary and

Capricious standard of the Administrative Procedure Act the scope of review is narrow

And deferential. 5 U.S.C.A. 706(2) In determining whether agency action is arbitrary

And capricious, under Administrative Procedure Act a court must consider whether the

Decision was based on a consideration of the relevant factors and whether there has been

A clear error of judgment. 5 U.S.C.A. 706(2)(A).

Under the arbitrary and capricious standard of the Administrative Procedure Act,

The court is not empowered to substitute its judgment for that of the agency. Agency

Action is valid if a reasonable basis exists for the agency's decision, whereby the agency

Consider the relevant factors and articulated a rational connection between the facts

Found and the choice made.

Although a court may uphold a decision of less than ideal clarity if the agency's path

May reasonably be discerned, the court may not infer an agency's reasoning from mere

Silence. In conducting review of an agency's decision, the court may look only to the

Administrative record to determine whether the agency has articulated a rational basis

3

For its decision. Post hoc explanations of agency action by counsel cannot substitute For the agency's own articulation of the basis for its decision. The BOP regulation 7310.04 should be ruled invalid under Administrative Procedure Act since BOP failed To articulate rationale for regulation so as to provide means for reviewing reasonableness Because they failed to explain why the monthly cost of 1,800.11 imprisonment that they Already get for each prisoner is not enough. The BOP also failed to a explain the monthly Cost of 1,593.32 for community conefinement that they already get for each inmates During the Pre Release part of sentence is not enough.

The BOP general desire for uniformity in application of regulation did not explain Why the funds that they already get for each inmates during its imprisonment is not Enough, as uniformity could have been accomplished in any number of way. An agency's Rule may ultimately be reasonable in substance but nevertheless fail review, under Administrative Procedure Act. If the agency does not comply with its procedural Responsibility to articulate in the administrative record the rational basis upon which it Relied in promulgating the rule. The question presented is whether the Bureau of Prisons Violated section 706(2)(A) of the Administrative Procedure Act when it Promulgated Program statement 7310.04 this court should hold that it did. BOP program statement States that CCCs, commonly referred to as halfway houses provide suitable residence, Structured programs, job placement, and counseling, while the inmates' activies are Closely monitored. Inmates are required to pay a subsistence charge to help defray the Cost of their confinement, this charge is 25% of their gross income not exceed the Average daily cost of their CCC placements. The record is silent on whether the BOP has Complied with statute 18 U.S.C. 3621(b) and 3624(c) and the averge daily cost of CCC

Placement. And failed to explain why the funds that the BOP already get for each

Inmate during its CCC placement is not enough. The record shows that cornell correction

Holds five different brands of inmates. Pre Release inmates. Public Law inmates. Pre

Trial inmates, Self Paid inmates, and CDC also known as state inmates. The only inmates

Forced to pay a subsistence charge is the Federal inmates in the Pre Release stage of their

Sentence. The State Prisoner in the Pre Release stage of their sentence are forced to give

Cornell corrections 50% of their gross income, but the funds is return upon being release

From cornell. Therefor they do not par any subsistence charge. This Conduct by BOP and

Cornell Corrections constitutes a violation of the inmate's rights under the equal

Protections provison of the 8th amendment and a 5th Amendment violation of Due Process

In the absence of a clear and established policy Petitioner and this court are left with

Out any criteria by which to determine the rational and justification for BOP's action

In forcing inmates to pay a subsistence charge to help pay the cost of their CCC

Placement the court must find that the BOP has violated the Administrative Procedure

Act by failing to explain why the funds that they already get for each inmates each month

Is not enough for the inmates CCC placement. This is a controversy ripe for

Determination. Abbott Labs v. Gardner 387 U.S. 136(1967. Whether a claim is ripe for

Adjudication depends on two factors;(1) whether the issue is fit for judicial dcision and

(2) whether the parties will suffer hardship if we decline to consider the issue. Freedom to

Travel Campaign v. Newcomb, 82 F.3d 1431(9th Cir 1996). This court must determined

Whether the BOP has violated the Administrative Procedure Act, and whether the BOP

Has complied with statute 18 U.S.C. in implementing Program Statement 7310.04, and

Whether Cornell Corrections is running a program that is discrimitory to certain group

Of inmates. The fact that Petitioner is soon to be release he can still get relief from This court by ordering that any funds that has been paid out to Cornell Corrections For subsistence charge be return back to Mr. Woodard. Petitioner has attemped to jump Through the requisite procedural hrdies to exhaust his administrative remedied. However To date these efforts have been fruitless. Whie BOP may fill gap where legislative actions So directs it, such gap filling must not be arbitrary, must provide notice to those affected And must follow the standards of the APA. The failure to consider a rational basis for its Decision is a violation of his constitutional rights. Engel v. Daniels, 459 F.Supp2nd 1053 (D.Or.2006) Under the APA agency actions, findings and conclusions will be upheld Unless they are arbitray capricious, an abuse of discretion, or otherwise not in Accordance with law. 18 U.S.C. 706(2)(a); see also Pac Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation 426 F.3d 1082(9th Cir 2005) The courts has addres BOP's legal duty to promulgate and abide by the reqirements of the APA in setting Standards for application of 18 U.S.C. 3621(b)and 3626(c) although courts has found Interim Rule to be within the BOP's discretion, certain Program Statements was rule Invalidated on a subsequent procedural challenge because it was promulgated in Violation of the notice-and comment privision of the APA. See Paulsen v. Daniels 413 F.3d 999(9th Cir 2005). On July 26, 2006, the district court issued an opinion And judgment denying relief in the case of Arrington v. Daniels and Williams v. Daniels. the court found two rational bases for the Bureau's decision to categorically Exclude from eligibility for early release those prisoners convicted of offenses Involving the possession carrying or use of firearms.(1) the increased risk that

6

Offenders with convictions involving firearms might pose to the public and (2)
The need for uniformity in the application of the eligibility regulation. The court found
In Arrington v. Daniels 516 F.3d 1106 9th Cir 2008 that neither of those bases withstands
Even our narrow and deferential standard of review under the APA. The First rationale
That is absent from the administrative record is an explenation on why the funds that is a
Already giving to the BOP is not enough during the pre-release placement in a CCC since
It is already stated that they get1,593.32 for community confinement. The court stated that
Counsel cannot argue issues that is not in the administrative record and forbidden to
Consider in conducting review under the APA Burlington Truck Lines, Inc 371 U.S. at
168, 83 S. Ct 239.

## CONCLUSION

Since The Bop failed to comply with the Administrative Procedure Act in Implementing
Program Statement 7310.04 to comply with statute 18 U.S.C. 3621(b) and 3624(c) should
Be ruled invalid and order that all subsistence charge that was collected by cornell
Corrections be return back to Petitioner. It is further requested that the court find that
Cornell Corrections is running a program that is discriminatory to certain groups of
Inmates. It is also requested that the court find that BOP program statement is in
Conflict with statute 18 U.S.C. 36219b) and 18 U.S.C. 3624(c). At last it requested grant
The relief that I may be entitle to. I *Marvin Woods* declare under penalty of perjury
That the foregoing is true and correct executed in the City of San Francisco on this 31 day
Of May                                          Respectfully Submitted

7

Exhibit A

### Request for Administrative Remedy Response

WOODARD, Marvin
Register Number: 98908-011
Cornell Corrections Inc., Residential Re-Entry Center (RRC)
San Francisco, CA
Remedy ID: 491204-F1

This is in response to your Administrative Remedy received on
April 25, 2008.  You have requested a subsistence waiver based on
documentation contained in your Pre-Sentence Report (PSR).

A thorough review of your request has been conducted.  According
to your PSR, page 22, section 79, reads, "He is in federal
custody and it appears he does not have the ability to pay a
fine".  The PSR does not have bearing on the required 25%
subsistence collection.  Furthermore, your Judgment and
Commitment order does not address this area.  Program Statement
7310.04, **Community Corrections Center Utilization and Transfer
Procedure**, page 4, section 7, subsection a, reads, "inmates are
required to pay a subsistence charge to help defray the cost of
their confinement; this charge is 25% of their gross income, not
to exceed the average daily cost of their CCC placements.
Failure to make subsistence payments may result in disciplinary
action".

Based on the above information, your request for relief is
denied.  If you are dissatisfied with this response and wish to
appeal, you may do so within 20 calendar days of the date of this
response by submitting a BP-230(10), to the Regional Director,
Federal Bureau of Prisons, Western Regional Office, 7950 Dublin
Blvd., Third Floor, Dublin, CA 94568.

Christopher N. Cruz
Community Corrections Manager

4.29.08
Date

6

## U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| From: B.G. Compton, Warden | Facility: USP Satellite Camp Lompoc, California | Date: 2-28-06 |
|---|---|---|

| Inmate's Name: WOODARD, Marvin    Exhibit B | Register No. 98908-011 (Alpha) |
|---|---|

| To: J. E. Gunja Regional Director, Western Region | Attn: Kim Beakey Regional Designator |
|---|---|

__X__ Transfer to: FCI Satellite Camp, Oxford, Wisconsin (Code 319)
____ Apply Management Variable(s):_____
____ Update Management Variable Expiration Date. (New Date): _____

1. Inmate's Medical Status:
There are no known medical or psychological restrictions which would preclude a transfer at this time.

2. Institution Adjustment:
WOODARD's institutional adjustment is currently considered good. WOODARD is currently assigned to the Camp Unicor Machine Shop, where he receives good work ratings. He has completed his $100.00 Felony Assessment imposed by the Northern District of California. The court has waived WOODARD's Cost of Incarceration Fee.

3. Disciplinary Record: There are no incident reports reflected on WOODARD's Custody Classification Form.

4. Rationale for Referral:
WOODARD is a 37-year old offender serving a 120-month, 3559 PLRA sentence with 5 years Supervised Release for Conspiracy to Possess a Controlled Substance with Intent to Distribute. He has a projected Good Conduct Time release date of January 12, 2009. There are no discrepancies noted between the Security Designation Data Form and Custody Classification Form. WOODARD is a Minimum security level inmate with Out custody. WOODARD currently has the drug assignment of DAP Wait. He has expressed interest in participating in the RDAP Program. The Unit Team requests he receive a Drug Abuse Program transfer to FCI Satellite Camp, Oxford, Wisconsin.

| 5a. Parole Hearing Scheduled:___ Yes _X_ No___ N/A | b. If yes, when_____ |
|---|---|

6. Note any past or present behavior and/or management/inmate concerns: None

Staff have checked the following SENTRY Programs to ensure that they are correct and current:

        Inmate Profile                          CIM Clearance and Separatee Data
        Inmate Load Data                        Custody Classification Form
        Sentence Computation                    Chronological Disciplinary Record

| Prepared by: M. Terrones, Case Manager | Reviewed by: C, Grigg, Unit Manager |
|---|---|

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of "CRP RV DT" to indicate the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.
(This form may be replicated via WP) This form replaces EMS-409 of AUG 99



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

| | |
|---|---|
| **OPI:** | CPD |
| **NUMBER:** | 7310.04 |
| **DATE:** | 12/16/98 |
| **SUBJECT:** | Community Corrections Center (CCC) Utilization and Transfer Procedure |

1.  <u>PURPOSE AND SCOPE</u>.  To provide guidelines to staff regarding the effective use of Community Corrections Centers (CCCs).  This Program Statement defines placement criteria for offenders, requires that staff members start the placement process in a timely manner, and defines the circumstances when inmates may refuse Community Corrections (CC) programs.  It also establishes an operational philosophy for CCC referrals that, whenever possible, eligible inmates are to be released to the community through a CCC unless there is some impediment as outlined herein.

CCCs provide an excellent transitional environment for inmates nearing the end of their sentences.  The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills.

One reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community.  Participating in community-based transitional services may reduce the likelihood of an inmate with limited resources from recidivating, whereas an inmate who is released directly from the institution to the community may return to a criminal lifestyle.  While clearly dangerous inmates should be separated from the community until completing their sentences, other eligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society.

Finally, the scope of this Program Statement has been extended to include CCC consideration/placement of District of Columbia Department of Corrections inmates.

2.  PROGRAM OBJECTIVES.  The expected results of this program
are:

   a.  All eligible inmates will have opportunities to participate
in CCC programs to assist with their reintegration into the
community, in accordance with their release needs.

   b.  All inmates will have opportunities to communicate directly
with staff who make significant CCC referral recommendations.

   c.  Referral packets for CCC placement will be timely and
complete.

   d.  Before any inmate is transferred to a CCC, the CCC staff
will have the required notice and other documentation.

   e.  The public will be protected from undue risk.

3.  DIRECTIVES AFFECTED

   a.  Directive Rescinded

      PS 7310.03     Community Corrections Center (CCC)
                     Utilization and Transfer Procedures (3/25/96)

   b.  Directives Referenced

      PS 1434.06     Jurisdiction on Escape Related Issues -
                     Memorandum of Understanding USMS/FBI/BOP
                     (7/25/94)
      PS 1490.04     Victim and Witness Notification (2/3/98)
      PS 5100.06     Security Designation and Custody
                     Classification Manual (6/7/96)
      PS 5110.12     Notifications of Release to State and Local
                     Law Enforcement Officials (1/21/98)
      PS 5180.04     Central Inmate Monitoring System (8/16/96)
      PS 5250.01     Public Works and Community Service Projects
                     (1/19/93)
      PS 5264.06     Telephone Regulations for Inmates (12/22/95)
      PS 5280.08     Furloughs (2/4/98)
      PS 5322.10     Classification and Program Review of Inmates
                     (9/4/96)
      PS 5325.05     Release Preparation Program, Institution
                     (7/18/96)
      PS 5330.10     Drug Abuse Programs Manual, Inmate (5/25/95)
      PS 5380.05     Financial Responsibility Program, Inmate
                     (12/22/95)

| | | |
|---|---|---|
| PS 5550.05 | Escape from Extended Limits of Confinement (3/27/96) |
| PS 5553.05 | Escapes/Deaths Notification (9/17/97) |
| PS 5800.07 | Inmate Systems Management Manual (12/24/91) |
| PS 5800.11 | Central File, Privacy Folder, and Parole Mini File (9/7/97) |
| PS 5873.05 | Release Gratuities, Transportation, and Clothing (9/4/96) |
| PS 5882.03 | Fines and Costs (2/4/98) |
| PS 6000.05 | Health Services Manual (9/15/96) |
| PS 6070.05 | Birth Control, Pregnancy, Child Placement, and Abortion (8/9/96) |
| PS 7300.09 | Community Corrections Manual (1/12/98) |
| PS 7320.01 | Home Confinement (9/6/95) |
| PS 7331.03 | Pretrial Inmates (11/22/94) |
| PS 7430.01 | Community Transitional Drug Treatment Services, Inmate (1/20/95) |

18 U.S.C. § 3621(b)
18 U.S.C. § 3624(c)

4.  STANDARDS REFERENCED

    a.  American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions:  3-4265, 3-4343, 3-4343-1,
3-4387, 3-4388, 3-4388-2, 3-4389, 3-4391, 3-4393, 3-4393-1

    b.  American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities:  3-ALDF-3E-04, 3-ALDF-4E-19,
3-ALDF-4E-19-1, 3-ALDF-4F-04, 3-ALDF-4F-05, 3-ALDF-4F-07,
3-ALDF-4G-01, 3-ALDF-4G-06, 3-ALDF-4G-07

    c.  American Correctional Association 2nd Edition Standards for
Administration of Correctional Agencies:  2-CO-4G-01, 2-CO-4G-02

    d.  American Correctional Association Standards for Adult
Correctional Boot Camp Programs:  1-ABC-3D-04, 1-ABC-4E-20,
1-ABC-4F-08, 1-ABC-4F-10, 1-ABC-4G-01, 1-ABC-4G-02, 1-ABC-4G-03,
1-ABC-4G-06

5.  STATUTORY AUTHORITY.  18 U.S.C. § 3624(c), provides:

    "The Bureau of Prisons shall, to the extent practicable,
    assure that a prisoner serving a term of imprisonment spends
    a reasonable part, not to exceed six months, of the last ten
    per centum of the term to be served under conditions that
    will afford the prisoner a reasonable opportunity to adjust

to and prepare for the prisoner's reentry into the
community.  The authority provided by this subsection may be
used to place a prisoner in home confinement.  The United
States Probation Office shall, to the extent practicable,
offer assistance to a prisoner during such pre-release
custody."

18 U.S.C. § 3621(b) provides:

"The Bureau of Prisons shall designate the place of the
prisoner's imprisonment.  The Bureau may designate any
available penal or correctional facility . . . the Bureau
determines to be appropriate and suitable."  A CCC meets the
definition of a "penal or correctional facility."

Therefore, the Bureau is not restricted by § 3624(c) in
designating a CCC for an inmate and may place an inmate in a CCC
for more than the "last ten per centum of the term," or more than
six months, if appropriate.

Section 3624(c), however, does restrict the Bureau in placing
inmates on home confinement to the last six months or 10% of the
sentence, whichever is less.

6.  <u>PRETRIAL/HOLDOVER AND/OR DETAINEE INMATES</u>.  This Program
Statement does not apply to pretrial, holdover, or detainee
inmates.

7.  <u>COMMUNITY-BASED PROGRAMS</u>

a.  <u>Community Corrections Centers (CCC)</u>.  CCCs, commonly
referred to as "halfway houses," provide suitable residence,
structured programs, job placement, and counseling, while the
inmates' activities are closely monitored.  All CCCs offer drug
testing and counseling for alcohol and drug-related problems.
During their stay, inmates are required to pay a subsistence
charge to help defray the cost of their confinement; this charge
is 25% of their gross income, not to exceed the average daily
cost of their CCC placements.  Failure to make subsistence
payments may result in disciplinary action.

These contract facilities, located throughout the United
States, provide two program components:  the Community
Corrections Component and the Prerelease Component:

(1)  The <u>Community Corrections Component</u> is designed as the
most restrictive option.  Except for employment and other
structured program activities, an inmate in this component is

restricted to the CCC.  An inmate shall ordinarily be placed in
the Community Corrections Component upon arrival at the CCC.

This orientation period normally lasts for two weeks or
until the inmate has demonstrated to CCC staff the responsibility
necessary to function in the community.  Based on their
professional judgment, CCC staff shall determine when an inmate
is prepared to advance to the Prerelease Component.

(2)  The Prerelease Component is designed to assist inmates
making the transition from an institution setting to the
community.  These inmates have more access to the community and
family members through weekend and evening passes.

b.  Community Corrections Programs.  In addition to a CCC's
traditional services, the Bureau also has the following
community-based programs.  Referral procedures may be described
in independent Bureau directives issuances.  The Community
Corrections Manager (CCM) reviews the inmate's characteristics
and the recommendations noted in the referral package to
determine if one of the following programs (if available) may be
more appropriate than traditional CCC placement.

(1)  Comprehensive Sanctions Center (CSC).  The CSC concept,
initiated by the Bureau, with the extensive cooperation and
teamwork of U.S. Probation and CCC contractors, was developed to
provide courts with a wider range of sentencing options and to
facilitate the development and implementation of community
program plans tailored to the individual needs of prerelease
inmates.

The CSC is designed to meet the needs of higher risk
prerelease inmates and consists of six different levels of
supervision, ranging from 24-hour confinement to Home
Confinement.

It also may have an intensive treatment component consisting
of substance abuse education and treatment, life skills training,
mental health counseling, education, employment assistance, and
mentoring.  The inmate's progress is systematically reviewed by a
Program Review Team (PRT), consisting of representatives from the
Bureau, U.S. Probation, and the CCC.

(2)  Mothers and Infants Together (MINT).  MINT is an
alternative residential program that promotes bonding and
parenting skills for low risk female inmates who are pregnant.
The inmate is placed in the program two months prior to delivery
and remains there for three months after delivery.

(3)  Home Confinement.  Home Confinement is a generic term
used to cover all circumstances in which an inmate is required to
remain at home during non-working hours of the day.  Electronic

monitoring equipment is sometimes used to monitor compliance with the program's conditions.  These programs provide an opportunity for inmates to assume increasing levels of responsibility, while, at the same time, providing sufficient restrictions to promote community safety and convey the sanctioning value of the sentence.

Home Confinement provides an option for inmates who do not need the structure of a residential facility.  Except for inmates who are initially sentenced to and graduate from the Intensive Confinement Center Program, statutory provisions limit the length of Home Confinement to the last 10% of the sentence, or six months, whichever is less.  Inmates are required to pay subsistence of 25% of their gross income to defray the costs of Home Confinement and electronic monitoring.

The Bureau is involved in two Home Confinement programs:  Home Confinement operates from the Bureau's own network of CCCs and the U.S. Probation Division program.

(a)  <u>CCC Contractors</u>.  The first form of Home Confinement is CCC contractor-operated programs.  In these programs, CCC staff monitor the inmate.  Currently, only a few of these programs use electronic monitoring equipment.  Supervision is provided by daily telephone contacts and periodic personal contacts in the home and workplace.

(b)  <u>U.S. Probation Office</u>.  The second form of Home Confinement involves placing federal inmates in programs operated by the U.S. Probation Office.  These programs use electronic monitoring equipment with U.S. Probation Officers (USPO) providing supervision.

(4)  <u>Transitional Services Program (TSP)</u>.  The community-based transition phase of the Bureau's Residential Drug Treatment Program is designed to complement the accomplishments and continue the institutional program's treatment plan.  It reinforces the inmate's personal responsibility to lead a drug-free lifestyle through personal accountability for choices, confrontation of negative thinking patterns, and instruction in basic social skills.  Inmates who successfully complete the Residential Drug Treatment Program's institutional phase should normally be considered for the maximum 180 day period of CCC placement, if they are otherwise eligible.

(5)  Intensive Confinement Center (ICC).  A lengthy period
of Community Corrections Center confinement follows the
completion of the ICC program's institutional phase.  The CCC
time is divided among the restrictive Community Corrections
Component, the Prerelease Component, and Home Confinement.
Specific referral procedures are outlined in the ICC Program
Statement.

8.  RELEASE PLAN.  Staff shall begin release planning at an
inmate's first team meeting, normally the initial classification,
and shall continue throughout the inmate's confinement.  The
following guidelines apply:

   a.  Planning early in an inmate's period of confinement is
necessary to ensure release preparation needs are identified and
appropriate release preparation programs are recommended.

   b.  Preliminary decisions regarding eligibility for CC Programs
are to be made well in advance of the last year of confinement.

   c.  A final and specific release preparation plan, including a
decision as to CCC referral, is normally established at a team
meeting no later than 11 to 13 months before an inmate's
projected release date.

9.  CCC CRITERIA AND REFERRAL GUIDELINES

   a.  Regular Referrals.  Staff shall make recommendations for
CCC placements based on assessments of inmate needs for services,
public safety, and the necessity of the Bureau to manage its
inmate population responsibly.  CCCs are a program element and
are not to be used as a reward for good institutional behavior,
although an inmate's institutional adjustment may be a factor in
making a referral determination.

   A number of factors must be weighed to determine the length of
CCC placement for inmates, including their individual needs and
existing community resources.  Ordinarily, inmates with shorter
sentences do not require maximum CCC placement due to reduced
transition needs.  Additionally, inmates who are required to
spend a portion of time in a CCC as a condition of release (i.e.
supervised release or court order) do not require an extended
Bureau CCC placement.  For example, if the Unit Team determines
the inmate needs a six month CCC placement, but the inmate is
required to stay in a CCC for 90 days as a condition of release,
then the institution shall ordinarily refer the inmate for a 60-
90 day CCC placement.

**Referrals to CCM offices should include a recommendation
regarding the length of stay (range), such as recommending 60 to
90 days or 90 to 120 days, etc. This range of at least 30 days
allows the CCM to match population needs with budgetary and CCC
bed space resources, a process which requires this flexibility.**

However, there will be cases when the institution, for various
management reasons, wants the CCM to place the inmate not earlier
than a specific date. Then, the CCC referral form should specify
a recommended placement date rather than a range and further
state that the CCM should not adjust that date. The CCM shall
adhere to the recommended date, with any adjustment only being
downward if budget and/or bed space constraints are a factor.

The following CCC referral guidelines apply:

(1)  An inmate may be referred up to 180 days, with
placement beyond 180 days highly unusual, and only possible with
extraordinary justification. In such circumstances, the Warden
shall contact the Regional Director for approval and the Chief
USPO in the inmate's sentencing district to determine whether the
sentencing judge objects to such placement.

(2)  The ultimate goal is to maximize each eligible inmate's
chances for successful release and a law-abiding life.

(3)  When an inmate has a history of escape or failure in
one or more CC Programs, careful review and consideration should
be given regarding the suitability of participation and the
length of placement.

(4)  Inmates with minor medical conditions or disabilities
may also be considered for community placement. Inmates are
required to assume financial responsibility for their health care
while assigned to community programs. Such inmates must provide
sufficient evidence to institution staff of their ability to pay
for health care while at a CCC prior to the referral being made.
When an inmate is unable or unwilling to bear the cost of
necessary health care, the inmate shall be denied placement.

(5)  Inmates who have been approved for CCC referral and are
otherwise appropriate for camp placement shall be transferred to
a camp for intermediate placement. The inmate should have
completed the Institution Release Preparation Program at the
parent institution. The parent institution shall complete the
CCC referral packet and the camp should be closer to the inmate's
release residence. This process should be completed to allow the

inmate a minimum of a 60 day placement at the camp prior to the acceptance date at the CCC.

b.  <u>MINT Referrals</u>.  Female inmates are eligible to enter the program at the CCC generally during their last two months of pregnancy.  After birth, the mother is allowed three additional months to bond with the child.  The mother shall then be returned to an institution to complete her sentence.  If she is eligible for prerelease services, she may remain at that facility only if she is going to be supervised in that judicial district.

The CEO may approve early or extended placements with a recommendation by the treating obstetrician and Clinical Director's concurrence.  A placement extending beyond 180 days requires the Regional Director's approval.  Direct court commitments shall have a secondary designation noted on the Inmate Load and Security/Designation form (BP-337).  This shall be used to determine the institution responsible for the inmate's medical expenses while she is confined in the MINT Program.

Authority to pay immediate post-natal care of the child born to an inmate while in custody is derived from administrative discretion when the Bureau finds itself responsible for the cost by default (no other resources can be compelled to pay).  It is reasonable that the Bureau provides for the child's medical expenses for the first three days after routine vaginal birth or up to seven days for a Cesarean section.

Prior to the birth, the mother must make arrangements for a custodian to take care of the child.  At this time, the CEO shall ensure the person or agency taking custody of the child is also asked to be responsibile for medical care costs beyond three days after birth.  (<u>Note</u>:  This may be extended by the Regional Director for an additional seven days for extenuating circumstances on a case-by-case basis.)  The person(s) receiving custody of the child should sign a Statement of Responsibility for medical care costs, clearly indicating that the signing party accepts financial responsibility.  Unit Management staff are responsible for obtaining this statement, and forwarding copies to the Health Services Administrator (HSA) for placement in the HSA's outside hospitalization file and to the Controller (see the Sample Statement of Responsibility (Attachment D)).

Health Services staff shall confirm an inmate's pregnancy and evaluate her medical condition.  Health Services staff shall indicate whether CCC placement is medically appropriate and document this on the Medical Evaluation for Transfer of Inmates to CCC Type Facility (BP-351) which shall be forwarded to the Unit Team.

When the Unit Team has concerns regarding the appropriateness of a CCC placement (such as criminal history, severity of current

offense), procedures will be followed according to Section 10.i.(2), Limitations on Eligibility for All CCC Referrals.

The following CCC referral guidelines apply in addition to the guidelines provided for regular referrals:

(1)   The inmate must be pregnant upon commitment with an expected delivery date prior to release.

(2)   The inmate or guardian must assume financial responsibility for the child's care, medical and support, while residing at the CCC.  Should the inmate or the guardian be unable or unwilling to bear the child's financial cost, the inmate may be transferred back to her parent institution.

(3)   An inmate who becomes pregnant while on furlough, or has more than five years remaining to serve on her sentence(s), or plans to place her baby up for adoption shall not be referred for MINT placement.

**Referrals to CCMs should state a specific date of placement. This date should be approximately two months prior to the inmate's expected delivery date.**

The CCC's Terminal Report should fully describe the inmate's experience in, and reaction to, the MINT Program.  It should also summarize counseling received in the program and include follow-up medical or program recommendations for the institution to facilitate the inmate's transition.

Inmates in need of foster care placement assistance shall be referred to the institution social worker, or if the institution does not have a social worker, staff shall contact a social worker in the community for foster care placement assistance.

10.  LIMITATIONS ON ELIGIBILITY FOR ALL CCC REFERRALS.   Inmates in the following categories shall not ordinarily participate in CCC programs:

a.   Inmates who are assigned a "Sex Offender" Public Safety Factor.

b.   Inmates who are assigned a "Deportable Alien" Public Safety Factor.

c.   Inmates who require inpatient medical, psychological, or psychiatric treatment.

d.   Inmates who refuse to participate in the Inmate Financial Responsibility Program.

e.   Inmates who refuse to participate, withdraw, are expelled, or otherwise fail to meet attendance and examination requirements in a required Drug Abuse Education Course.

f.   Inmates with unresolved pending charges, or detainers, which will likely lead to arrest, conviction, or confinement.

g.   Ordinarily, inmates serving sentences of six months or less.

h.   Inmates who refuse to participate in the Institution Release Preparation Program.

i.   Inmates who pose a significant threat to the community. These are inmates whose current offense or behavioral history suggests a substantial or continuing threat to the community.

Examples are inmates with repeated, serious institution rule violations, a history of repetitive violence, escape, or association with violent or terrorist organizations.

To determine whether an inmate poses a significant threat, a number of factors must be considered.  The key consideration is public safety when assessing the inmate's proclivity for violence or escape against their placement needs.

A waiver of the Public Safety Factor is not required for inmates transferred via unescorted transfer to CCC placements.

Ordinarily, inmates with a single incident of violence should not automatically be excluded from CCC placement.  As noted earlier, clearly dangerous inmates should be excluded from CCC placement.

(1)   When there exists a basis for significant doubt regarding whether the inmate currently poses a threat to the community, the Warden should consider contacting the Chief USPO in the release district (see the Sample letter (Attachment A)) to seek guidance on the referral's appropriateness.  A copy of this letter shall be maintained in the Inmate Central File.

(2)   When an inmate is excluded under this subsection, a memorandum, signed by the Warden, shall be prepared and placed in the Inmate Central File to explain the rationale for exclusion from CC Programs.

j.   Inmates whose admission and release status is pretrial, holdover, or detainee.

PS 7310.04
12/16/98
Page 12

11.  REFUSALS.  When an eligible inmate refuses CCC placement,
staff shall investigate the inmate's reasons.  Staff may honor an
inmate's refusal of CCC placement.

Suitable reasons to decline placement might include previous CCC
failure, potential conflict with other residents, and location or
remoteness from release residence.  When the inmate does not
present a suitable reason, and the unit team believes that a
placement would serve a correctional need, the unit team shall
make every effort to encourage participation.

When an inmate refuses placement, a memorandum, signed by the
Associate Warden (Programs) and the inmate, shall be placed in
the Inmate Central File.  The memorandum should document the
inmate's rationale for refusal and all unit team effort to
encourage participation.

12.  CCC REFERRAL PROCEDURES.  Normally 11 to 13 months before
each inmate's probable release date, the unit team shall decide
whether to refer an inmate to a Community Corrections program.

Medical staff shall notify the inmate's Case Manager promptly
when a pregnancy is verified.  Upon notification, the unit team
shall decide if a MINT referral to a Community Corrections
program will be made.

   a.  Referral to CCM.  Staff shall use the Institution Referral
form (BP-210) (Attachment B) when referring an inmate for
transfer to a CCC.  Information included in the Additional
Information (11) and Specific Release Preparation Needs (12)
sections must be as specific as possible regarding the inmate's
needs.

   Attachment B contains instructions for completing the
Institution Referral form and related materials.  Signed copies
of the "Community Based Program Agreement" must be included with
all CCC referrals.  The Warden is the final decision-making
authority for all CCC referrals the unit team recommends.

   If the Warden approves the CCC referral, the unit team shall
forward two copies of the Institutional Referral form and
appropriate attachments to the CCM.  Staff shall enter the DST
SENTRY assignment of "W CCC ACT."  Copies of appropriate
documents are prepared so that one may be forwarded to the CCC
while the CCM retains the other for reference.

   A separate packet with appropriate copies shall be forwarded to
the Transitional Services Manager (TSM) in the **receiving region
where the inmate is being released** for graduates of Residential
Drug Abuse Programs.  Staff are referred to the Drug Abuse
Programs Manual for responsibilities and/or documentation
requirements.  If the CCC referral packet is mailed prior to

completion of the Treatment Summary and Referral form (BP-549),
the Drug Abuse Treatment Coordinator shall forward the completed
BP-549 form to the Transitional Services Manager in the region of
the inmate's release and provide a copy to the unit team.

The referral packet shall be forwarded to the CCM at least 60
days prior to the maximum recommended range or date.  However,
additional time may be required for processing inmates with
special community-based program needs (i.e. mental health, drug
transition, disabilities, and inmates with higher security
needs).

For MINT referrals, the referral packet shall ordinarily be
forwarded to the CCM at least 60 days prior to the recommended
date.  If the inmate is committed to Bureau custody or arrives at
the designated facility at any stage during the second trimester
of pregnancy, the referral shall be forwarded to the CCM as
quickly as possible.

If an inmate is scheduled for release via parole, and CCC
placement is for 45 days or less, a copy of correspondence
directed to the U.S. Parole Commission (USPC) outlining the
release plan and requesting parole certificates, as well as
copies of the USPO's letter recommending release plan approval,
must be included in the referral package.

b.  <u>Mandatory CCC Residence</u>.  When an inmate must reside in a
CCC as a condition of parole, mandatory release, or supervised
release supervision after release from confinement, the
institution shall refer the case to the appropriate CCM, who
shall refer the case for placement under these procedures:

Institutions shall notify the USPC of cases that cannot be
placed (see specific information in Attachment B).  Inmates in
this category should not be referred for transitional purposes
and have this time "stacked" on to the Court or USPC's ordered
period of CCC placement.

Inmates releasing from an institution via 3621E CMPL or 4046C
CMPL, or who have mandatory CCC residence as a condition of
parole, mandatory release, or supervised release supervision,
should be referred for release preparation transfer to a CCC, and
the CCM should work with U.S. Probation to waive the CCC
requirement during the period of supervision.  The CCM shall
attempt to affect the 180 day release preparation placement for
inmates releasing via 3621E CMPL or 4046C CMPL.  The CCM shall
keep the appropriate U.S. Probation Office apprised of the
inmate's progress toward reaching the goals of Community
Corrections programming.  Should the USPO still require CCC
placement as a condition of supervision, the CCM will ordinarily
honor the request.

c.  Referral to CCC.  CCMs shall immediately forward referrals to appropriate CCCs.  CCC staff shall notify CCMs in writing of acceptance or rejection.  When referrals are accepted, CCCs will send acceptance letters, subsistence collection agreements, and CCC rules and regulations to inmates in care of their Unit Managers.  Institution staff shall ensure acknowledgment forms are returned to CCCs.  CCMs shall monitor referrals for timely response from contractors.

d.  CCC Rejection.  CCC staff must provide specific reasons, in writing, to CCMs when they reject referrals.  In such cases, CCMs shall determine if further discussion with the CCC staff is appropriate or, if not, referral to an alternate resource is possible.  When all placement options have been exhausted, the CCM shall inform the referring institution Warden, with copies to the Unit Manager, that the inmate cannot be transferred to a CCC and the reason for rejection.

e.  Transfer Date.  When CCMs are notified of an inmate's acceptance by a CCC, a transfer date to the CCC is to be established, and the CCM shall enter the SENTRY destination assignment transaction.  The effective date shall be the approved future transfer date.

Destination assignments, "DST," have been established in SENTRY for contract CCCs and work release programs.  These assignments use the CCM facility code followed by the contract location code.  CCMs may add their contract location destination assignments for inmates in any Bureau facility.  When an inmate arrives at the CCC and is admitted to the location (in SENTRY), the destination assignment is automatically removed.

These assignments shall appear on the CCM and institution SENTRY daily log.  Institution staff may display rosters of inmates approved for CCC transfer, and CCMs may display lists of pending arrivals by contract location.

The location description (name of the CCC) shall appear on the inmate's profile.  If, for any reason, an inmate cannot be

transferred to a CCC on the scheduled date, institution staff shall notify the CCM immediately.

13.  <u>PREPARATION FOR TRANSFER</u>

a.  <u>Trust Fund Account</u>.  No later than **three weeks** prior to the approved transfer date, unit staff are to determine the amount in the inmate's trust fund account that may be given to the inmate at the time of transfer.  A check or draft for the balance (with the inmate as payee) shall be sent to the CCC immediately.

In accordance with the Program Statement on Telephone Regulations for Inmates, inmates transferring to CCCs shall be qualified as "exception" cases during the three-week period prior to the approved transfer date for purposes of placing collect telephone calls.

Institution staff should use discretion in giving inmates large amounts of cash, and if there is reason to question an inmate's ability to handle money responsibly, the amount may be reduced.

For inmates who have no funds or resources, unit staff shall determine the extent to which a gratuity is indicated and shall initiate paperwork, if appropriate (see the Program Statement on Release Gratuities, Transportation, and Clothing).

If the institution is holding savings bonds for an inmate, or if an inmate has a savings account at a local bank, the unit staff is to ensure these financial resources are available at the release destination when the inmate arrives.

b.  <u>Documentation to CCC</u>.  No later than **two weeks** prior to an inmate's approved transfer date, institution staff shall forward the following documents to the CCC:

(1)  Authorized Unescorted Commitments and Transfers (BP-385), with current photograph;

(2)  Original of the Transfer Order;

(3)  Copy of Furlough Application and Approval Record, with specific travel method and itinerary;

(4)  Receipt for CCC rules and regulations, if applicable (this may include the CCC's subsistence agreement form); and,

c.  <u>Clothing</u>.  No later than **one week** prior to an inmate's approved transfer, staff shall make arrangements for release clothing.  Suitable release clothing shall be provided as described in the Program Statement on Release Gratuities, Transportation, and Clothing.  For non-MINT referrals, at a minimum, release clothing is to include adequate clothing to

complete a job search and perform work.  Additionally, an outer
garment, seasonably suitable for weather conditions at the
inmate's release destination, shall be provided.

d.  Medication.  No later than **one week** prior to an inmate's
approved transfer, Health Services staff shall review the
inmate's medical record to determine if the inmate is on
continuous medication.  When an inmate is transferred to a CCC, a
30-day supply of chronic medication shall be provided pursuant to
a new prescription.  If an inmate is prescribed a controlled
substance, assistance from the CCM may be required to determine
if the CCC can accommodate the inmate's special medication needs.
Staff should refer to the Health Services Manual for further
clarification.  CCC staff are to safeguard, store, and dispense
controlled substances in accordance with the terms of their
Bureau contracts.

e.  Identification.  It is essential that each inmate have some
acceptable form of identification while at a CCC.  Therefore,
during Institution Release Preparation Programs, unit staff shall
assist inmates to acquire social security cards (mandatory) and,
if possible, drivers license, and copies of their birth
certificates.  Additional photo identification may be required if
the inmate is using air transportation.  These items may be given
to an inmate on the transfer date, or mailed to CCCs **prior to**
transfer with the materials described in subsection b. above.

f.  Community Custody Status.  An inmate must be assigned
"COMMUNITY" custody status prior to transfer to a CCC.  Unit
staff shall state the inmate's current custody status if other
than "COMMUNITY" on the Transfer Order in the Custody
Classification section.  Next to the current custody, unit staff
shall type "Community custody effective on (whatever date the
Warden deems appropriate)."

g.  Parole Commission Review of Disciplinary Action.  An inmate
who has had a discipline hearing resulting in a Discipline
Hearing Officer finding, after USPC action to establish a
presumptive or effective parole date, may not be transferred to a
CCC until the Commission has considered the disciplinary report
and final action has been taken.

h.  Sentence Calculation.  The Inmate Systems Manager (ISM) of
the sending institution shall ensure that an inmate's old law
sentence computation is "complete" with all appropriate good time
entered before the inmate departs the institution.

i.  Final Review of 3621(e) Eligibility.  The decision to grant
an inmate early release is a significant one for the Bureau;
therefore, it is essential that unit staff carefully review
relevant statutory and regulatory criteria before an inmate's
final release under 18 U.S.C. § 3261(e).  Specifically, the Unit

Manager or designee must ensure completion of "Final Review of 3621(e) Eligibility" (Attachment K from the Drug Abuse Programs Manual), before unescorted transfer to a CCC or release to a detainer (Drug Abuse Programs Manual, Inmate). Attachment K must be completed and routed to the Warden. Ordinarily, Attachment K should be routed to the Warden along with other CCC release paperwork (i.e., transfer order, furlough application, etc.); however, a copy of Attachment K is not forwarded to the CCC.

The Drug Abuse Program (DAP) Coordinator and CMC must review and sign Attachment K prior to the Warden's review. The DAP Coordinator's review is to ensure that items 5, 7, and 8 are accurate. Once Attachment K is signed and dated, the Unit Manager must ensure that a copy is filed in the disclosable portion of Section 5 (release processing) in the Inmate Central File. The original Attachment K shall be forwarded to the ISM for filing in the Judgment and Commitment (J&C) file.

**No inmate shall be released from an institution to a CCC (or detainer) until the ISM receives the Attachment K with appropriate signatures.**

    j. Education. To assist an inmate in securing employment, the inmate should have a resume', a copy of his or her education transcript, GED certificate, and any other education/vocational training certificates completed during his or her confinement.

    k. Exemption from Time Requirements. When transfer dates have not been established in time for staff to implement the above procedures within the time requirements, they shall be accomplished as soon thereafter as possible.

14. TRANSFER AND ARRIVAL NOTIFICATION

    a. Transportation Costs. Staff are referred to the Program Statement on Furloughs for procedures regarding transportation costs for inmates scheduled for transfer to a CCC.

    b. Notification of Travel Schedule. On the date of transfer, the sending institution's ISM shall notify the CCM via BOPNet GroupWise of the inmate's departure and travel schedule. A copy of this notification shall be placed in the inmate's J&C file. If GroupWise is inoperable, the notification shall be made by telephone and documented in the J&C file.

    c. Arrival Notification. CCC staff shall notify CCMs immediately when an inmate arrives as a transfer from an institution. Immediately means:

        (1) Upon arrival, if during regular CCM working hours; or

        (2) At the first opportunity during regular CCM working

hours if arrival is during evenings, weekends, or holidays.

d. <u>Electronic Notification</u>. By close of the business day following an inmate's scheduled arrival, the CCM shall "admit" the inmate in SENTRY, if the CCC has confirmed the inmate's arrival. When GroupWise is inoperable, notification of arrival shall be made by telephone to the sending institution's ISM, and the inmate "admitted" in SENTRY at the earliest opportunity.

e. <u>Escape</u>. If an inmate has not arrived at the CCC within a reasonable period after the scheduled arrival time (no later than 24 hours), the CCM shall report the inmate as an escapee. Then, the ISM at the sending institution must be notified immediately by telephone or GroupWise.

The ISM at the sending institution is responsible for updating SENTRY to indicate the change in release status from "furlough transfer" to "escape" as of the date the inmate fails to report. The ISM at the sending institution also shall make the inmate's sentence computation inoperative as of the date following the escape. Staff at the sending institution shall write an incident report and conduct a UDC/DHO hearing in absentia. The sending institution shall make all notifications required by the Program Statement on Escapes/Deaths Notification. The ISM at the sending institution shall also notify the FBI of the inmate escape. The ISM at the sending institution must also fax a copy of the Notice of Escaped Federal Prisoner (BP-393) to the FBI, U.S. Marshals Service, local law enforcement officials, and law enforcement at the inmate's home of record. The Inmate Central File is to be retained at the sending institution.

The CCM shall notify the U.S. Marshals Service in the CCC district. The CCM shall also notify the Regional Director, the Central Office, and the sending institution via GroupWise of the escape.

f. <u>Arrival Confirmation</u>. The ISM at the sending institution shall use SENTRY to confirm an inmate's arrival at a CCC. When an inmate's arrival is confirmed, the ISM shall forward the following documents to the CCM by certified mail:

(1)  Applicable release forms and certificates that have been completed insofar as is possible by unit staff and reviewed by ISM;

(2) Victim/Witness Notification form (BP-323), if applicable;

(3)  Completed and current committed fine forms and all related documentation such as the PSI, if applicable;

(4) Copies of conditions of supervised release, if applicable; and

(5) Appropriate forms and other documentation concerning final good conduct time awards for an inmate sentenced under the CCCA.

15.  INMATE CENTRAL FILE.  The Inmate Central File shall be retained at the institution consistent with provisions established in the Program Statement on Inmate Central File, Privacy Folder, and Parole Mini-files.

/s/
Kathleen Hawk Sawyer
Director



FORM 49808 :**TOPS**

**PERSONAL MONEY ORDER**

SERIAL #:  000431 4813

ACCOUNT#:  4861-505352

**March 21, 2008**

**\*\*\$58.00\*\***

00043    11-24
Office AU #    1210(8)

Purchaser:    **MARVIN WOODARD**
Purchaser Account:  7707297012
Operator I.D.:    cu013113    cu013955

PAY TO THE ORDER OF    \*\*\*CORNELL CORRECTIONS\*\*\*

\*\*\*Fifty-eight dollars and no cents\*\*\*

NOTICE TO PURCHASER--IF STOP PAYMENT IS PLACED ON THIS
INSTRUMENT, WELLS FARGO BANK MAY IMPOSE A WAITING
PERIOD BEFORE ISSUING A REPLACEMENT OR REFUND.

VOID IF OVER US $   58.00

**NON-NEGOTIABLE**

**Purchaser Copy**

**WELLS FARGO BANK, N.A.**
UNION TRUST OFFICE
2 GRANT AVE
SAN FRANCISCO, CA 94108
FOR INQUIRIES CALL (480) 394-3122

FB004    M4203

---

| 00043 | 11-24 |
| Office AU # | 1210(8) |

**PERSONAL MONEY ORDER**

SERIAL #:  0004313240

ACCOUNT#:  4861-505360

Purchaser:  **MARVIN WOODARD**
Purchaser Account:  **7656214389**
Operator I.D.:  **cu008177**

**April 07, 2008**

PAY TO THE ORDER OF        ***CORNELLS CORRECTION***

**\*\*$165.00\*\***

***One hundred sixty-five dollars and no cents***

VOID IF OVER US $   165.00

**NON-NEGOTIABLE**

NOTICE TO PURCHASER--IF STOP PAYMENT IS PLACED ON THIS
INSTRUMENT, WELLS FARGO BANK MAY IMPOSE A WAITING
PERIOD BEFORE ISSUING A REPLACEMENT OR REFUND.

**WELLS FARGO BANK, N.A.**
2 GRANT AVE
SAN FRANCISCO, CA 94108
FOR INQUIRIES CALL (480) 394-3122

**Purchaser Copy**

FB/004       M4203

---

| 00006 | 11-24 |
| Office AU # | 1210(8) |

**PERSONAL MONEY ORDER**

SERIAL #:  0000614267

ACCOUNT#:  4861-505360

Purchaser:  **MARVIN WOODARD**
Purchaser Account:  **7656214389**
Operator I.D.:  **casp0408**

**May 01, 2008**

PAY TO THE ORDER OF        ***CORNELL CORRECTIONS***

**\*\*$130.00\*\***

***One hundred thirty dollars and no cents***

VOID IF OVER US $   130.00

**NON-NEGOTIABLE**

NOTICE TO PURCHASER--IF STOP PAYMENT IS PLACED ON THIS
INSTRUMENT, WELLS FARGO BANK MAY IMPOSE A WAITING
PERIOD BEFORE ISSUING A REPLACEMENT OR REFUND.

**WELLS FARGO BANK, N.A.**
1266 MARKET ST
SAN FRANCISCO, CA 94102
FOR INQUIRIES CALL (480) 394-3122

**Purchaser Copy**

FB-004    M4203  07325881

# PERSONAL MONEY ORDER

SERIAL #: 0000614351

ACCOUNT#: 4861-505360

00006
Office AU #    11-24
1210(8)

Purchaser:    **MARVIN WOODARD**
Purchaser Account:    **7656214389**
Operator I.D.:    **cu015260**

May 28, 2008

PAY TO THE ORDER OF    ***CORNELL CORRECTIONS***

***One hundred thirty-nine dollars and no cents***

**\*\*$139.00\*\***

VOID IF OVER US $  139.00

**NON-NEGOTIABLE**

**WELLS FARGO BANK, N.A.**
1266 MARKET ST
SAN FRANCISCO, CA 94102
FOR INQUIRIES CALL (480) 394-3122

\*NOTICE TO PURCHASER-IF STOP PAYMENT IS PLACED ON THIS
INSTRUMENT, WELLS FARGO BANK MAY IMPOSE A WAITING
PERIOD BEFORE ISSUING A REPLACEMENT OR REFUND.

## Purchaser Copy

FB-004    M4203 08045461

```
Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611019822
Cashier ID: almaceh
Transaction Date: 06/03/2008
Payer Name: MARVIN WOODARD
------------------------------------
WRIT OF HABEAS CORPUS
 For: MARVIN WOODARD
 Case/Party: D-CAN-3-08-CV-002765-001
 Amount:      $5.00
------------------------------------
MONEY ORDER
 Check/Money Order Num: 57-65388559
 Amt Tendered: $5.00
------------------------------------
Total Due:      $5.00
Total Tendered: $5.00
Change Amt:     $0.00

SI (PR)


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.
```

Marvin Woodard 98908-011
Cornell Corrections
111 Taylor Street
San Francisco Ca 94102











UNITED STATES POSTAL SERVICE

0000    94102

U.S. POSTAGE
PAID
SAN FRANCISCO, CA
94102
JUN 02, 08
AMOUNT
$1.20
0002 7685-12



PRIORITY MAIL
UNITED STATES POSTAL SERVICE
Label 107R, February 2006
www.usps.com

7008 0500 0001 6661 3133


PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL™


7008 0500 0001 6661 3133

Clerk office for United
States District Court for the
Northern District of California
450 Golden Gate Avenue Box 36060
San Francisco Ca 94102